APPEAL NO. 14-12481-A CONSOLIDATED WITH 13-15444-A

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

JAMES HILL, AS GUARDIAN AND NEXT FRIEND OF B.H.J., A MINOR,

*PLAINTIFF-APPELLANT*

V.

MADISON COUNTY SCHOOL BOARD; *ET AL.,*

*DEFENDANTS-APPELLEES*

---

APPEAL
FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

---

BRIEF OF THE PLAINTIFF-APPELLANT

---

Attorneys for Appellant, JAMES HILL,
as Guardian and next friend of B.H.J., a minor,

D. Anthony Mastando
Teri Ryder Mastando
Eric J. Artrip
MASTANDO & ARTRIP, LLC
301 Washington Street, Suite 302
Huntsville, Alabama 35801
256-532-2222

Neena K. Chaudhry
Fatima Goss Graves
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle, Suite 800
Washington, DC 20036
202-588-5180

James Hill, *et al* v. Madison County School Board; *et al.*; 14-12481-A

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| **JAMES HILL, *ET AL.*** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **APPEAL NO. 14-12481-A** |
| | ) | |
| **MADISON COUNTY SCHOOL BOARD,** | ) | |
| ***ET AL.,*** | ) | |
| | ) | |
| **Defendants.** | ) | |

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

The following is a list of all judges, attorneys, persons, associations of persons, firms, partnerships, corporations, and other legal entities known to Appellant that have an interest in the outcome of this case, pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1:

1.      Artrip, Eric A., Counsel for Plaintiff/Appellant, James Hill, as guardian of B.H.J.

2.      Belser, H. McGriff, III, Counsel for Defendant/Appellee, June Ann Simpson.

3.      Blair, Ronnie J., Defendant/Appellee.

4.      Boardman, Mark S., Counsel for Defendant/Appellee Jeanne Dunaway.

5.      Boardman, Carr, Bennett, Watkins, Hill & Gamble, P.C., Counsel for

Defendant/Appellee, Jeanne Dunaway.

6.      Carr, Clay R., Counsel for Defendant/Appellee, Jeanne Dunaway.

7.      Chaudhry. Neena K, Counsel for Plaintiff/Appellant, James Hill, as guardian of B.H.J.

8.      Dunaway, Jeanne, Defendant/Appellee.

9.      Edwards, Belser & Smith, Counsel for Defendant/Appellee, June Ann Simpson.

10.     Graves, Fatima Goss, Counsel for Plaintiff/Appellant, James Hill, as guardian of B.H.J.

11.     James Hill, as guardian of B.H.J., Plaintiff/Appellant.

12.     J., B.H., Plaintiff/Appellant.

13.     Madison County Board of Education, Defendant/Appellee.

14.     Mastando & Artrip, LLC, Counsel for James Hill, as guardian of B.H.J., Plaintiff/Appellant.

15.     Mastando, Teri Ryder, Counsel for James Hill, as guardian of B.H.J., Plaintiff/Appellant.

16.     National Women's Law Center, Counsel for James Hill, as guardian of B.H.J., Plaintiff/Appellant.

17.     Putnam, Honorable T. Michael, United States Magistrate Judge, Northern District of Alabama.

18.    Simpson, June Ann, Defendant/Appellee.

19.    Terrell, Teresa G., Defendant/Appellee.

Respectfully submitted this the 17th day of June, 2014.

s/ Eric J. Artrip

Eric J. Artrip (ASB-9673-I68E)
Teri Ryder Mastando (ASB-4507-E53T)
MASTANDO & ARTRIP, LLC
301 Washington Street, Suite 302
Huntsville, Alabama 35801
Phone:        (256) 532-2222
Fax:            (256) 513-7489
artrip@mastandoartrip.com
teri@mastandoartrip.com

Neena K. Chaudhry
Fatima Goss Graves
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle, Suite 800
Washington, DC 20036
Phone: (202) 588-5180
Fax: (202) 588-5185
nchaudry@nwlc.org
fgraves@nwlc.org

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff/Appellant, pursuant to Federal Rules of Appellant Procedure 34(a) and Eleventh Circuit Rule 34-3, requests oral argument. Oral argument could assist the Court in consideration of the issues raised herein, expressly the causes of action the Plaintiff/Appellant has under 20 U.S.C. §§ 1681-1688 ("Title IX"), the Equal Protection and Substantive Due Process Clauses of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983 ("Section 1983"). Oral argument could assist the Court regarding the record herein.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ................................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ........................... i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF CITATIONS ...................................................................... v

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION ................................................................................... x

I. STATEMENT OF THE ISSUES ...................................................... 1

II. STATEMENT OF THE CASE ......................................................... 2

    A. Nature of the Case ................................................................... 2

    B. Procedural History ................................................................... 2

    C. Statement Of The Facts ............................................................ 4

        1. BHJ's Childhood ............................................................. 4

        2. SMS Faculty .................................................................... 4

        3. School Board Policies ...................................................... 5

            a. Sexual harassment policy ..................................... 5

            b. Disciplinary record policies ................................. 7

            c. Destruction of CJC's disciplinary records ........... 8

        4. CJC's  Recorded History of Sexual Harassment Against
Fellow Students .................................................................. 8

            a. Infractions During the 2008/2009 School Year at
Ardmore High School ............................................. 9

b. Infractions during the 2008/2009 School Year at SMS ........................................................................ 9

c. Infractions during the 2009/2010 School Year at SMS ........................................................................ 9

5. CJC's Unrecorded History of Harassing Female Students ............................................................... 10

6. CJC's Sexual Harassment of BHJ ................................. 12

7.The Rape of BHJ ......................................................... 12

8. The Aftermath ............................................................ 15

9. Lasting Effects of the Rape on BHJ .............................. 17

III. STANDARD OF REVIEW ............................................ 18

IV. SUMMARY OF ARGUMENT ....................................... 21

V. ARGUMENT AND CITATION OF AUTHORITY ......................... 21

A. The School Board Violated Title IX Because It Was Deliberately Indifferent to Known Hostile Environment Harassment. .................................................................. 21

1. Appropriate School Officials Had Actual Notice of Sexual Harassment. .............................................. 23

2. BHJ's Rape Clearly Constitutes Hostile Environment Harassment. ...................................... 27

3. Appropriate School Officials Were Deliberately Indifferent to Known Sexual Harassment. .......................... 30

B. Defendants Are Liable under 42 U.S.C. § 1983 for Violating BHJ's Right to Equal Protection. ................................. 37

1. The School Board Deprived BHJ of Her Equal
Protection Right to be Free from Sex Discrimination........ 39

    a. The School Board violated BHJ's equal
    protection rights because Principal Blair's sexual
    harassment policy was deliberately indifferent to
    the obvious risk of further harassment and caused
    BHJ's rape.............................................................. 39

    b. The School Board violated BHJ's equal
    protection rights because its failure to train its
    employees on addressing sexual harassment
    complaints was deliberately indifferent to the risk
    of future harassment and led to BHJ's rape............. 42

2. The Individual Defendants Deprived BHJ of Her Equal
Protection Right to be Free from Sex Discrimination and
Are Not Entitled to Qualified Immunity... ......................... 43

C. Defendant June Simpson is Liable under 42 U.S.C. § 1983 for
Violating BHJ's Right to Substantive Due Process ..................... 46

D. Defendant Blair is not Immune as an Agent of the State of
Alabama on Plaintiff's Negligence and Wantonness Claims....... 49

E. Defendant Simpson's Plan to Use BHJ as Bait to Catch CJC
in the Act of Sexual Harassment, and Her Failure to Protect BHJ
from a Rape, is Outrageous Conduct........................................... 53

F. The District Court Should Have Inferred that Destroyed
Records of CJC's Multiple Disciplinary Matters Would Benefit
Plaintiff. ...................................................................................... 54

VI. CONCLUSION AND STATEMENT OF RELIEF SOUGHT........ 56

CERTIFICATE OF COMPLIANCE...................................................... 58

CERTIFICATE OF SERVICE ............................................................... 59

# <u>TABLE OF CITATIONS</u>

U.S. STATUTES

20 U.S.C. §§ 1681 ............................................................. i

28 U.S.C. § 1291 .............................................................. x

28 U.S.C. § 1331 .............................................................. x

28 U.S.C. § 1343(a)(3) .................................................... x

42 U.S.C. § 1983 ........................................................... i, x

CASES

*Akins v. Fulton County, Ga.*, 420 F.3d 1293 (11th Cir. 2005) ......... 46

*Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989 (11th Cir. 1990) ................................................................. 37

*Benefield v. Board of Trustees of University of Alabama*, 214 F. Supp. 2d 1212 (N.D. Ala. 2002) ....................................... 29

*Bridge Capital Investors, II v. Susquehanna Radio Corp.*, 458 F.3d 1212 (11th Cir. 2006) ........................................................ 18

*C.C. v. Monroe County Bd. of Educ.*, 299 F. App'x 9372 (11th Cir. 2008) ................................................................... 51

*Cooper v. Dillon*, 403 F.3d 1208 (11th Cir. 2005) ........................... 39

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) .................... 47

*Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490 (11th Cir. 1995) ..................................... 37, 44, 45

*Davis v. Carter*, 555 F.3d 979 (11th Cir. 2009) .............................. 47, 48

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999) ........... passim

*DiStiso v. Cook*, 691 F.3d 226 (2d Cir. 2012) .................................. 38, 41

*Doe v. Sch. Bd of Broward County*, *Fla.* 604 F.3d 1248, 1254 (11th Cir. 2010) ...................................................................................... passim

*Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir. 1993) ....................................................................................... 36

*Ex parte Butts*, 775 So. 2d 173 (Ala. 2000)...................................... 50

*Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000) .............................. 49, 53

*Ex parte Davis*, 721 So. 2d 685 (Ala. 1998)..................................... 50

*Ex parte Wood*, 852 So. 2d 705 (Ala. 2002)..................................... 49

*Feliciano v. City of Miami Beach*, 707 F.3d 1244 (11th Cir. 2013). 6, 7, 17

*Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246 (2008) ........... 38

*Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130 (9th Cir. 2003) ............................................................................................... 38, 45

*Flury v. Daimler Chrysler Corp.*, 427 F.3d 939 (11th Cir. 2005).... 18, 55

*Giambrone v. Douglas*, 874 So. 2d 1046 (Ala. 2003) ...................... 49, 50, 51

*Godby v. Montgomery County Bd. of Educ.*, 996 F. Supp. 1390 (M.D. Ala. 1998)............................................................................. 41

*Gold v. City of Miami*, 151 F.3d 1346 (11th Cir. 1998) ................... 42

*Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009) ............................................................. 54

*Hallmark Developers, Inc. v. Fulton County, Ga.*, 466 F.3d 1276 (11th Cir. 2006).................................................. 18

*Harrelson v. R.J.*, 882 So. 2d 317 (Ala. 2003) ................................. 53, 54

*Hawkins v. Sarasota County School Board*, 322 F.3d 1279 (11th Cir. 2003) ......................................................... 27

*Hill v. Madison County Sch. Bd.*, 957 F. Supp. 2d 1320 (N.D. Ala. 2013................................................................ passim

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004) ............................................................. 41

*Hope v. Pelzer*, 536 U.S. 730 (2002) ................................................ 44

*Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647 (7th Cir. 2011) ............................................................. 47

*Jennings v. Univ. of N.C.*, 444 F.3d 255 n.12 (4th Cir. 2006).......... 27, 28

*Jones v. Indiana Area Sch. Dist.*, 397 F. Supp. 2d 628 (W.D. Pa. 2005) ............................................................. 26

*Little v. McClure*, No. 5:12-CV-147(MTT), 2014 WL 3778963, at *3 (M.D. Ga. July 31, 2014) ............................................. 56

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986).............. 37

*Monell v. Dep't of Soc. Services of City of N. Y.*, 436 U.S. 658 (1978) ............................................................. 37

*Montgomery v. Indep. Sch. Dist. No. 709*, 109 F. Supp. 2d 1081 (D. Minn. 2000)......................................................... 26

*Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238 (10th Cir. 1999) ............................................................................ passim

*N.C. v. Caldwell*, 77 So. 3d 561 (Ala. 2011) ................................... 52

*Neal ex rel. Neal v. Fulton County Bd. of Educ.*, 229 F.3d 1069 (11th Cir. 2000).............................................................. 48

*Nix v. Franklin County Sch. Dist.*, 311 F.3d 1373 (11th Cir. 2002). 47

*Patrick v. Great Valley Sch. Dist.*, 296 F. App'x 258 (3d Cir. 2008) 47

*Scott v. Estes*, 60 F. Supp. 2d 1260, 1275 (M.D. Ala. 1999)............ 53

*Shively v. Green Local Sch. Dist. Bd. of Educ.*, No. 13-3423, 2014 WL 4211100, at *7 (6th Cir. Aug. 27, 2014)................................... 38, 44

*Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007) .............................................................................. 33

*Smith ex rel. Lanham v. Greene County Sch. Dist.*, 100 F. Supp. 2d 1354 (M.D. Ga. 2000)....................................................... 41

*Soper v. Hoben*, 195 F.3d 845 (6th Cir. 1999)................................. 28

*Stack v. Stream,* 988 So. 2d 516 (Ala 2008) ................................... 50, 51

*Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226 (10th Cir. 1999) ............................................................................ 47

*Thomas v. City of Clanton*, 285 F. Supp. 2d 1275 (M.D. Ala. 2003) 46

*United Auto Workers v. Johnson Controls*, 499 U.S. 187 (1991) .... 36

*Vance v. Spencer County. Pub. Sch. Dist.*, 231 F.3d 253 n.4 (6th Cir. 2000) ............................................................................ 27

*Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300 (11th Cir. 2003) ........................................................................ 47

*West v. Atkins*, 487 U.S. 42 (1988) .................................................. 37

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282 (11th Cir. 2007) ..................................................................... passim

*Woodard v. Wal-Mart Stores*, 801 F. Supp. 2d 1363 (M.D. Ga. 2011) ................................................................................. 55

*Wyke v. Polk County Sch. Bd.*, 129 F.3d 560 (11th Cir. 1997)......... 39

*Zinermon v. Burch*, 494 U.S. 113 (1990).......................................... 46

## RULES

34 C.F.R. §§ 106.9.  106.8a-b.......................................................... 33

## OTHER

Office for Civil Rights, U.S. Dep't of Educ., Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties 12 (2001), available at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf............ passim

Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter: Sexual Violence 4-5 (Apr. 4, 2011), available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf ..................................................................... 7, 22, 25, 50

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This is an appeal from the United States District Court for the Northern District of Alabama, Northeastern Division, brought by Plaintiff James Hill, as Guardian and next friend of BHJ, a minor. Plaintiff asserts violations of 20 U.S.C. §§ 1681-1688 ("Title IX"), the Equal Protection and Substantive Due Process Clauses of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983 ("Section 1983"), and Alabama state law. The District Court exercised jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C 1343 § (a)(3).

On December 17, 2013, the Court entered an Order of Dismissal dismissing without prejudice the remaining pendant state law claims against all Defendants, entering a final disposition of Plaintiff's federal action. (Doc. 122.) On December 30, 2013, Plaintiff filed a Motion to Alter or Amend Judgment. (Doc. 123.) On May 19, 2014, the District Court denied Plaintiff's Motion to Alter or Amend its grant of summary judgment on all federal and some state law claims. (Doc. 132.) Plaintiff filed a Notice of Appeal on June 3, 2014. (Doc. 133.) This Court has jurisdiction under 28 U.S.C. § 1291.

## I.    STATEMENT OF ISSUES

1.    Whether the District Court erred by granting summary judgment to the Madison County School Board under Title IX.

2.    Whether the District Court erred by granting summary judgment to the Madison County School Board under Section 1983 for violation of BHJ's rights under the Equal Protection Clause.

3.    Whether the District Court erred by granting summary judgment to the Individual Defendants under Section 1983 for violation of BHJ's rights under the Equal Protection Clause.

4.    Whether the District Court erred by granting summary judgment to Defendant Simpson under Section 1983 for violation of BHJ's rights under the Substantive Due Process Clause.

5.    Whether the District Court erred by granting summary judgment to Defendant Blair under Alabama law for Negligence and Wantonness.

6.    Whether the District Court erred by granting summary judgment to Defendant Simpson under Alabama law for Outrage.[1]

---

[1] Plaintiff is not appealing the grant of summary judgment to Defendants Blair, Dunaway and Terrell on Plaintiff's Substantive Due Process Clause and state law Outrage claims, and to Defendant Terrell on Plaintiff's Negligence and Wantonness claims.

7.    Whether the District Court erred by failing to infer that CJC's disciplinary records would have supported Plaintiff's case in light of their destruction by Defendants after receipt of a spoliation letter.

## II.    STATEMENT OF CASE

### A. Nature of the Case

This case deals with the liability of the Madison County School Board and its officials for maintaining and implementing a policy of only documenting and punishing sexual harassment if a student was "caught in the act."  Pursuant to this policy, Defendants failed to effectively address repeated harassing conduct toward multiple female students by a male student, CJC.  When a fourteen-year-old special education student, BHJ complained of CJC's harassment, school officials sent her to meet him in the boy's bathroom as bait in a sting operation to catch him "in the act."  Before any staff arrived, CJC raped BHJ in the bathroom.

BHJ's rape was a direct result of policies implemented by, and acts of, the School Board and its officials Ronnie Blair, Jeanne Dunaway, Teresa Terrell, and June Simpson, in violation of her rights under Title IX, the Fourteenth Amendment to the U.S. Constitution, and Alabama law.

### B. Procedural History

Plaintiff filed a Complaint on September 23, 2010 (Doc. 1) and an Amended Complaint on October 29, 2010 (Doc. 9) against the Madison County School

Board, CJC (a minor), Blair, Terrell, Dunaway, and Simpson.

On July 19, 2012, Defendants School Board, Blair, Terrell, and Dunaway filed a Motion for Summary Judgment on all claims. (Doc. 86.) As part of Plaintiff's Response, Plaintiff moved that the Court infer that documents destroyed by Defendants supported Plaintiff's claims. (Doc. 94.) On July 12, 2013, the District Court granted in part and denied in part Defendants' motion—granting summary judgment on all claims against the School Board, Blair and Terrell and on the federal and Outrage claims against Dunaway, and denying Plaintiff's motion for a negative inference. The Court left pending state law claims for Wantonness and Negligence against Dunaway. (Doc. 105.)

On October 24, 2013, the District Court granted Defendant Simpson summary judgment on the Section 1983 and Outrage claims and denied her summary judgment on the state law claims for Negligence and Wantonness. (Doc. 113.)

Only Plaintiff's state law claims for Wantonness and Negligence remained pending against Dunaway and Simpson. On November 22, 2013, Dunaway appealed the District Court's denial of summary judgment on the Negligence and Wantonness claims.[2] (Doc. 116.) On December 17, 2013, the District Court dismissed the state law claims against Dunaway and Simpson without prejudice to

---

[2] That appeal has been consolidated with Plaintiff's.

refile in state court.  (Doc. 122.)  On December 30, 2013, Plaintiff filed a Motion to Alter or Amend Judgment.  (Doc. 123.)

On May 19, 2014, the District Court denied Plaintiff's Motion to Alter or Amend the grant of summary judgment.  (Doc. 132.)  Plaintiff filed a Notice of Appeal on June 3, 2014.  (Doc. 133.)

### C. Statement of Facts

#### 1.  BHJ's Childhood

Due to her mother's illness and untimely death in 2007, BHJ spent parts of her childhood in foster homes in North Carolina.  (Doc. 87-1 BHJ Dep., pg. 15:4-16:5, 23:8-26:3, Mar. 29, 2012.)  In 2008, BHJ moved to Huntsville, Alabama to live with her siblings' stepmother, Patricia Jones, before starting seventh grade. (Doc. 87-1, pg. 16:7-17, 30:3-4.)  BHJ attended seventh and a portion of eighth grade at Sparkman Middle School ("SMS").  (Doc. 87-1, pg. 30:5-12.)  She is designated as a special education student.  (Doc. 87-1, pg. 126:20-127:15.)  She was fourteen when raped by CJC in January 2010.  (Doc. 87-1, pg. 105:9-11.)

#### 2.  SMS Faculty

Ronnie Blair was in January 2010, and remains, the Principal at SMS.  (Doc. 87-2 Blair Dep., pg. 10:2-8, Mar. 29, 2012.)  A principal has ultimate authority for operation of a school.  (Doc. 87-9 Blair 30(b)(6) Dep., pg. 128:9-12, June 8, 2012.) Teresa Terrell and Jeanne Dunaway were, in January 2010, the Assistant Principals

at SMS.  (Doc. 87-8 Terrell Dep., pg. 11:11-22, 19:11-15, Mar. 29, 2012; Doc. 87-7 Dunaway Dep., pg. 15:1-5, Mar. 29, 2012.)  During BHJ's eighth-grade year, June Simpson was a teacher's aide at SMS.  (Doc. 93-1 Simpson Aff. ¶ 1, June 7, 2012.)  Simpson's direct supervisors in January 2010 were Blair, Dunaway and Terrell.  (Doc. 93-1 ¶ 2.)  All faculty and staff at SMS reported to Blair.  (Doc. 87-2, pg. 13:6-8.)

### 3.  School Board Policies

#### a.  Sexual harassment policy

SMS distributes a Student Code of Conduct to all students containing a School Board policy regarding sexual harassment of students.  (Doc. 87-2, pg. 105:18-108:3; Doc. 87-4 Blair Dep. Exs. 4-5; *see also* Doc. 87-9, pg. 88:5-91:1, Exs. 7-8.)  According to this policy, the principal is responsible for handling all harassment complaints. (Doc. 87-2, pg. 109:1-5.)  A student may report harassment to the "principal, assistant principal, a teacher or to whomever he/she feels the most comfortable."  (Doc. 87-4 Exs. 4-5.)  The person receiving the complaint "shall" make the complaint known to the principal, and the principal "shall" investigate the complaint and take appropriate action.  (Doc. 87-4 Exs. 4-5.)[3]

According to Principal Blair, a student may report sexual harassment to

---

[3] The School Board also has a general anti-harassment policy that covers harassment, violence, and threats based on sex and other characteristics.  (Doc. 87-4 Ex. 5; *see also* Doc. 87-9 Ex. 9.) It provides for discipline for students that violate the policy and makes the principal or his designee responsible for receiving and responding to complaints.

anyone at the school, including a teacher's aide. (Doc. 87-2, pg. 23:19-23, 26:14-19.) All staff should elevate complaints of sexual harassment to the Principal or Assistant Principals. (Doc. 87-8, pg. 40:1-6; Doc. 87-7, pg. 16:21-17:3; Doc. 87-2, pg. 24:1-6.) However, at SMS, staff can also investigate complaints of sexual harassment. (Doc. 87-2, pg. 24:13-16; Doc. 87-9, pg. 64:15-65:2.)

Blair implemented the School Board's sexual harassment policy at SMS as follows: no student would be disciplined for sexual harassment unless they were "caught in the act" through witnesses, an admission, or physical evidence.[4] (Doc. 87-2, pg. 53:16-54:8; Doc. 87-8, pg. 48:12-50:23; Doc. 87-7, pg. 17:20-19:3; Doc. 93-1 ¶ 4.) According to Blair, a student would not be disciplined for sexual harassment if the only evidence was "one word against another without witnesses." (Doc. 87-2, pg. 54:2-8.) Further, if a student complained of sexual harassment and the complaint was not considered "proven," the disciplinary form reflecting the report and related documents were simply discarded. (Doc. 87-8, pg. 48:12-49:18, 57:15-58:14; *see also* Doc. 87-2, pg. 34:2-13.)[5]

---

[4] Although Blair now denies having such a policy, he continues to assert that punishment would require witness statements or other corroborating evidence. (Doc. 87-9, pg. 143:9-144:17.) It is therefore not contested that there was a policy and practice of not pursuing harassment complaints involving only the word of the complainant against that of the alleged harasser, no matter how credible the complainant's allegations. To the extent there is inconsistent evidence regarding the imposition of a "catch in the act" policy, the Court must accept the evidence in the light most favorable to Plaintiff. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013).

[5] Assistant Principal Terrell admitted that the policy of discarding complaints that do not meet this standard of "proof" means there is no system in place to track prior complaints (e.g., that the

Also, while the School Board policy empowered all school employees to receive complaints of peer sexual harassment (Doc. 87-2, pg. 23:19-23, 26:14-19; Doc. 87-4 Exs. 4-5; Doc. 87-9, pg. 63:3-65:2), the Board did not train employees about Title IX's requirements for responding to such complaints[6] (Doc. 87-8, pg. 51:1-15, 66:2-17; Doc. 93-1 ¶ 17).   In fact, repeated requests for training by Teacher's Aide Simpson were ignored.  (Doc. 93-1 ¶ 17.)[7]

### b.  Disciplinary record policies

When a student is found guilty of misconduct, related documents are kept in paper form in a student's file.  (Doc. 87-2, pg. 47:6-20.)  If disciplinary action is ultimately taken, then it is entered into the state's computer system with an infraction code noting the nature of the offense—such as "sexual harassment" or "inappropriate touching."  (Doc. 87-2, pg. 47:13-48:14; Doc. 87-8, pg. 120:17-121:12.)  While infraction codes are used so administrators have knowledge of a student's past behavior and can consider the cumulative or recidivistic nature of

---

same "unfounded" complaint of sexual harassment was made against the same person ten times). (Doc. 87-8, pg. 59:10-60:11.)

[6] Under Title IX, schools must take immediate action to eliminate a hostile environment, prevent its recurrence, and address its effects.  *See* Office for Civil Rights, U.S. Dep't of Educ., <u>Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties</u> 12 (2001), *available at* http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf [hereinafter 2001 Sexual Harassment Guidance]; Office for Civil Rights, U.S. Dep't of Educ., <u>Dear Colleague Letter: Sexual Violence</u> 4-5 (Apr. 4, 2011), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf [hereinafter 2011 Sexual Violence Letter].

[7] To the extent there is any inconsistency regarding whether the School Board provided training for school employees on investigating complaints of sexual harassment, it must at this stage be resolved in the light most favorable to Plaintiff.  *See Feliciano*, 707 F.3d at 1247.

infractions, the Assistant Principals at SMS received no training on the codes. (Doc. 87-8, pg. 127:16-128:1, 136:21-137:8.)

The paper documents related to "proven" incidents of misconduct are kept only for the remainder of the school year. (Doc. 87-9, pg. 93:12-23; Doc. 87-7, pg. 19:16-20:7.)

### c. Destruction of CJC's disciplinary records

Principal Blair received a letter from Plaintiff's counsel dated April 30, 2010, three months after BHJ's rape, notifying the school of the potential lawsuit and demanding that all related documents be preserved. (Doc. 87-2, pg. 145:1-8, Doc. 87-6 Blair Dep. Ex. 12.) Despite having received this letter prior to the end of the 2009/2010 school year, Defendants destroyed an untold number of documents relating to CJC's disciplinary history—leaving only the records in the computer system. (Doc. 87-8, pg. 139:12-144:15.)

### 4. CJC's Recorded History of Sexual Harassment Against Fellow Students

Due to Defendants' destruction of documents, CJC's disciplinary record amounts to only bare bones summaries of numerous incidents recorded in the computer system. CJC's computer disciplinary record includes, in pertinent part, the following:

### a. Infractions During the 2008/2009 School Year at Ardmore High School

- 9/24/08: CJC received five days of in-school suspension for "Inapp Public Display of Affect," described in the notes as "Touching girls in inappropriate places. Writing inappropriate note to girls asking them to have sex with him." (Doc. 87-9 Ex. 11.)

### b. Infractions during the 2008/2009 School Year at SMS

- 2/4-/09: CJC received out-of-school suspension for "sexual harassment" for making "inappropriate comments" to a female student. (Doc. 87-2, pg. 122:15-21; Doc. 87-4 Ex. 6.)

### c. Infractions during the 2009/2010 School Year at SMS

- 9/23/09: CJC received out-of-school suspension for "harassment" for offering one girl money to beat up another girl and stating "he would like to kill her";
- 9/29/09: CJC failed to follow directions while already in in-school suspension;
- 10/16/09: CJC received in-school suspension for a verbal altercation;
- 10/23/09: CJC was removed from the bus for saying 'f__ you' to the bus driver;
- 10/28/09: CJC received in-school suspension for "inappropriate touching";
- 10/30/09: CJC was disciplined for disruption and disrespect in in-school suspension;
- 11/18/09: CJC was removed from the bus for failing to obey the driver and keep his hands off a female student;
- 11/25/09: CJC received in-school suspension for disobedience and "kissing";

9

- 12/15/09: CJC received in-school suspension for verbal confrontation with another student;
- 12/18/09: CJC received out-of-school suspension for "threats" and "intimidation" for threatening another student while in in-school suspension;
- 1/13/10: CJC received twenty days of in-school suspension for constant disruption in class;
- 1/22/10: CJC raped BHJ in the boys' bathroom. (Doc. 87-4 Ex. 6; Doc. 87-5 Blair Dep. Ex. 7.)

The records that Defendants did not destroy reflect that CJC had an extensive history of "proven" sexual harassment and threats of violence during the months and year prior to his rape of BHJ. (Doc. 87-2, pg. 132:20-133:2; Doc. 87-4 & Doc. 87-5 Exs. 6-7; Doc. 87-9 Ex. 11.) Principal Blair admitted that CJC's disciplinary record shows he was in trouble "more than an average" amount. (Doc. 87-2, pg. 152:4-11.) Blair agreed that the cumulative nature of CJC's extensive number of infractions in a tight timeframe should have been taken into account when considering disciplinary action. (Doc. 87-2, pg. 164:6-21, 166:5-14.)

### 5. CJC's Unrecorded History of Harassing Female Students

Principal Blair admitted that as early as the 2008/2009 school year, he was aware of allegations that CJC was propositioning girls for sex at SMS. (Doc. 87-9, pg. 133:12-20.) Teacher's Aide Simpson stated that before Thanksgiving 2009 there were numerous stories of CJC asking female students to have sex with him in the boys' bathroom, which she relayed to Blair shortly after Christmas break, along with her suggestion that CJC be monitored at all times. (Doc. 93-1 ¶ 4.)

According to Simpson, Blair told her CJC would have to be "caught in the act" before disciplinary action could be taken against him.  (Doc. 93-1 ¶ 4; Doc. 87-2, pg. 53:16-23.)

Blair admitted that the week before BHJ's rape Simpson had told him CJC was meeting another female student in the bathroom to have sex.  (Doc. 87-2, pg. 30:10-31:3.)  Upon questioning, both students denied any sexual contact.  (Doc. 87-2, pg. 35:5-11.)  Blair did not check CJC's prior record as a result of this complaint because "nothing was proven."  (Doc. 87-2, pg. 40:3-41:2.)

On January 13, 2010, just days before BHJ's rape, CJC was accused of inappropriately touching a girl in a sexual manner.  (Doc. 87-7, pg. 21:12-22:6; Doc. 87-2, pg. 41:16-43:2.)  The Assistant Principals interviewed witnesses, but did not take CJC's extensive history of harassment into account nor review his disciplinary files.  (Doc. 87-7, pg. 44:4-46:22.)  Per Terrell, because some witnesses said it happened and others said it did not, they "didn't have any proof" of the inappropriate touching.  (Doc. 87-8, pg. 146:3-7.)

As a result, CJC received twenty days of in-school suspension after this incident, but this placement was not considered "discipline" for proven misconduct by CJC, but rather a "precautionary measure."  (Doc. 87-2, pg. 43:9-22, 46:4-13.) The incident was recorded in CJC's disciplinary report as "constant distraction, continued disruption of learning" and classified as "disobedience."  (Doc. 87-788,

11

pg. 144:16-23.)   The report did not mention the inappropriate touching at all because, under Blair's implementation of the sexual harassment policy, it could not be "proven."  (Doc. 87-8, pg. 146:18-147:17.)

As part of his "precautionary" in-school suspension, CJC was assigned **unsupervised** cleaning duties in the hallway.  (Doc. 87-2, pg. 44:14-23, 152:14-154:4; Doc. 87-8, pg. 189:4-190:23, 196:16-198:5.)   CJC was still in this "precautionary" unsupervised in-school suspension when he raped BHJ on January 22, 2010.  (Doc. 87-2, pg. 44:10-13; 152:14-17.)  Blair agreed that if CJC had been found guilty of the January 13th allegations, he likely would not have been doing unsupervised cleaning, but rather his discipline "would have been something higher."  (Doc. 87-2, pg. 154:11-18.)

### 6.  CJC's Sexual Harassment of BHJ

CJC began pressuring BHJ to have sex with him in the school bathroom about two weeks before he raped her.  (Doc. 87-1, pg. 50:14-52:6.)  BHJ initially ignored him (Doc. 87-1, pg. 52:12-17), but then, on January 21, 2010, told Teacher's Aide Simpson about the harassment.  (Doc. 87-1, pg. 54:3-9.)

### 7.  The Rape of BHJ

On January 22, 2010, while on "precautionary" in-school suspension, CJC was in the hallway on unsupervised cleaning duty.  (Doc. 87-1, pg. 55:3-9; Doc. 93-1 ¶5.)  When BHJ passed him on her way to PE, CJC stopped her and again

asked her to have sex with him.  (Doc. 87-1, pg. 55:15-56:12.)  BHJ ignored him and continued to class (Doc. 87-1, pg. 56:4-14), where she told Teacher's Aide Simpson that CJC was still "messing" with her (Doc. 87-1, pg. 60:16-61:1; Doc. 93-1 ¶ 5).

Simpson asked BHJ if she wanted to get CJC in trouble, and BHJ responded that she did, because she wanted CJC to leave her alone.  (Doc. 87-1, pg. 61:8-16, 141:1-11.)  Simpson asked BHJ if she would meet CJC in the bathroom to "set him up" so he would be caught because he had "been doing this awhile."  (Doc. 87-1, pg. 61:8-20; Doc. 93-1 ¶ 5.)  Simpson suggested this course of action because Principal Blair told her that CJC had to be "caught in the act" before disciplinary action could be taken against him.  (Doc. 93-1 ¶ 5.)  BHJ responded that she did not want to meet CJC.  (Doc. 87-1, pg. 61:21-23; Doc. 93-1 ¶ 5.)  After sitting in the locker room for a few minutes, BHJ went back to Simpson to say she would meet CJC as suggested.  (Doc. 87-1, pg. 62:7-19, 64:22-65:8; Doc. 93-1 ¶ 6.)

Simpson and BHJ went to Assistant Principal Dunaway's office.  (Doc. 93-1 ¶ 7.)  According to BHJ, Simpson told "one of the female principals" that BHJ was going to meet CJC in the bathroom.  (Doc. 87-1, pg. 65:15-66:20.)  According to Simpson, she told both Dunaway and Andrea Hallman (a faculty member) that she had suggested BHJ meet CJC in the bathroom so he could be caught in the act of harassment.  (Doc. 93-1 ¶ 8.)  Simpson told them that she "hoped this was legal"

and that she did not know what she was doing.  (Doc. 93-1 ¶ 8.)  Dunaway did not tell Simpson there was anything inappropriate about the plan.  (Doc. 93-1 ¶ 8.)[8]

Simpson sent BHJ to tell CJC she would meet him.  (Doc. 87-1, pg. 67:22-68:3.)  Simpson then returned to the gym, where BHJ's friend told her that BHJ was on her way to meet CJC in the bathroom.  (Doc. 93-1 ¶¶ 8-9.)  Simpson returned to Dunaway's office and advised her that BHJ was going to meet CJC.  (Doc. 93-1 ¶ 10.)  Simpson asked Ms. Hallman to go to the bathroom to catch CJC, but Hallman refused because she "did not want . . . to catch another student with their clothes off."  (Doc. 93-1 ¶ 10.)  Dunaway heard this conversation but said and did nothing.  (Doc. 93-1 ¶ 10.)

Simpson then asked John Kennedy, a teacher whose classroom was across from the bathroom, and Coach Lance Hallman to check the bathroom, while she waited in the gym.  (Doc. 93-1 ¶¶ 12-13.)

CJC told BHJ to meet him in the boys' bathroom and he would follow her.  (Doc. 87-1, pg. 68:19-21.)  BHJ walked ahead of CJC and tried to walk slowly.  (Doc. 87-1, pg. 69:21-70:4.)  BHJ stood outside the bathroom by the drinking fountain.  (Doc. 87-1, pg. 70:5-7.)  CJC arrived and asked her if she was going in, and she responded "yes."  (Doc. 87-1, pg. 70:16-71:1.)  CJC told BHJ to go into a

---

[8] Assistant Principal Dunaway now denies having any prior knowledge of this plan.  (Doc. 87-10 Dunaway Aff. 2, July 19, 2012.)  The District Court properly concluded that the evidence, when viewed favorably to Plaintiff, established that Dunaway was told about the plan to use BHJ as bait to catch CJC in the act of harassment before it was implemented.  *Hill v. Madison County Sch. Bd.*, 957 F. Supp. 2d 1320, 1334 (N.D. Ala. 2013).

stall, and she complied.  (Doc. 87-1, pg. 71:15-21.)  In spite of her protests to CJC that teachers would come, her attempts to delay him, her attempts to block him from unbuttoning her pants, her efforts to talk him out of it and to pull her pants back up, and her telling him specifically she did not want to do this, CJC raped BHJ anally.  (Doc. 87-1, pg. 76:6-79:23.)  CJC then attempted to rape BHJ again.  (Doc. 87-1, pg. 80:9-19.)  BHJ kept telling CJC "I just can't do this" and attempted to block herself until teachers finally arrived.  (Doc. 87-1, pg. 82:9-21.)

### 8.  The Aftermath

Mr. Kennedy finally arrived in the bathroom, asked if anyone was there, saw them, and asked them to come out.  (Doc. 87-1, pg. 83:3-84:3; Doc. 87-5 Blair Dep. Ex. 8.)  BHJ and CJC exited the stall.  (Doc. 87-1, pg. 84:4-8).  A female teacher, Melody Campbell, asked BHJ what had happened and BHJ at first was not able to tell the teacher she had been raped but responded "yes" to Ms. Campbell's question about whether CJC had touched her.  (Doc. 87-1, pg. 86:6-87:11; Doc. 87-5 Ex. 8.)  She was able to tell her about the rape on the way to Principal Blair's office.  (Doc. 87-1, pg. 92:1-15.)  Assistant Principal Terrell, who saw BHJ and CJC as they walked to Blair's office, told BHJ she would probably be suspended.  (Doc. 87-8, pg. 153:14-154:6.)  Teacher's Aide Simpson later told Terrell that BHJ should not be in trouble because Simpson had "sent her."  (Doc. 87-8, pg. 154:17-19.)

BHJ initially was unable to tell Blair about the rape, and just sat in his office and cried. (Doc. 87-1, pg. 88:5-89:4.) After her guardian, Ms. Jones, arrived, and with Simpson in the room, BHJ was able to tell Blair that CJC had raped her. (Doc. 87-1, pg. 90:11-92:22.) The police arrived, and a male officer asked her questions. (Doc. 87-1, pg. 93:12-20.) BHJ wrote a handwritten statement consistent with her testimony of her rape. (Doc. 87-1 Ex. 1; Doc. 87-2, pg. 68:18-20.)

After meeting with the police, Ms. Jones took BHJ to the Madison County Children's Advocacy Center where the anal rape was confirmed by a physical exam and documented with numerous pictures. (Doc. 87-1, pg. 95:8-96:2; Doc. 93-2 Hill Aff. Ex. A, June 11, 2012.)

Blair had everyone involved write a statement. (Doc. 87-2, pg. 64:5-7; Doc. 87-5 Ex. 8.) Blair spoke with CJC, who denied the rape and wrote a statement to that effect. (Doc. 87-2, pg. 64:23-66:11; Doc. 87-5 Ex. 8.) Blair called Simpson to his office and instructed her to write and sign a statement regarding what happened, threatened her with criminal prosecution and termination, and suggested she resign. (Doc. 93-1 ¶ 15.) Simpson eventually did write a statement. (Doc. 93-1 ¶ 15; Doc. 87-5 Ex. 8.) Later, Blair apologized for his actions and told Simpson he had to get a statement from her to protect the School Board from potential legal ramifications. (Doc. 93-1 ¶ 16.)

When investigating the rape, school administrators reviewed CJC's prior record. (Doc. 87-2, pg. 73:22-74:2.) CJC was suspended for five days and a hearing was held at the School Board's central office. (Doc. 87-2, pg. 67:9-14.) CJC was ultimately placed in an alternative school. (Doc. 87-2, pg. 95:15-19.)

### 9. Lasting Effects of the Rape on BHJ

BHJ does not recall returning to SMS after she was raped.[9] (Doc. 87-1, pg. 99:7-13, 101:13-20). Instead, she returned to the foster program in North Carolina, and finished eighth grade there. (Doc. 87-1, pg. 13:22-15:6, 30:16-31:9.) BHJ missed some school before starting in North Carolina. (Doc. 87-1, pg. 99:23-100:7). She saw a therapist to help her deal with the rape and was prescribed medication for depression. (Doc. 87-1, pg. 120:5-121:20.)

Before the rape, BHJ played basketball (Doc. 87-1, pg. 35:19-36:16), and her grades were As, Bs, and Cs (Doc. 87-1, pg. 124:12-13). After the rape, BHJ testified that she preferred to be alone, no longer trusted anyone, and no longer felt safe. (Doc. 87-1, pg. 122:14-22.) She stopped playing basketball. (Doc. 87-1, pg. 36:17-22, 123:7-16). She has had trouble with grades, sometimes receiving all Fs, because she felt depressed and unable to focus. (Doc. 87-1, pg. 124:8-125:4.) At the time of her deposition, BHJ was still receiving counseling from a mental health

---

[9] Defendants assert that BHJ did return to SMS for a short time following her rape (Doc. 87-8, pg. 174:21-175:3), but this Court must resolve any factual dispute in Plaintiff's favor. *Feliciano*, 707 F.3d at 1247. In any event, it is not disputed that BHJ suffered many negative effects as a result of her rape, including ultimately leaving SMS, which interfered with her educational opportunities.

professional.  (Doc. 87-1, pg. 130:6-131:18.)  In high school, BHJ had to repeat some ninth-grade classes during her tenth-grade year (Doc. 87-1, pg. 26:15-27:5), and she received in-school suspension for acting angry toward teachers (Doc. 87-1, pg. 32:17-33:13).

## III.    STANDARD OF REVIEW

The Court of Appeals reviews *de novo* the District Court's grant of summary judgment,  viewing all facts and reasonable inferences drawn therefrom in the light most favorable to the non-moving party.  *Bridge Capital Investors, II v. Susquehanna Radio Corp.*, 458 F.3d 1212, 1216 (11th Cir. 2006) (internal quotation omitted).  "Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Hallmark Developers, Inc. v. Fulton County, Ga.*, 466 F.3d 1276, 1283 (11th Cir. 2006).

The Court of Appeals reviews the District Court's decision regarding spoliation sanctions for abuse of discretion.  *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 943 (11th Cir. 2005).

## IV.    SUMMARY OF ARGUMENT

Principal Blair, Assistant Principals Terrell and Dunaway, and Teacher's Aide Simpson responded to a known pattern of sexual harassment by student CJC in a highly unreasonable manner, culminating in the rape of BHJ.  Neither the

School Board nor Principal Blair trained school officials how to respond to sexual harassment complaints consistent with the law.  Instead, Blair, who was given the ultimate authority to address sexual harassment at SMS, implemented a policy of only documenting and punishing sexual harassment if the harasser was "caught in the act" by witnesses, physical evidence or an admission.  This policy is inconsistent with the school's Title IX obligations to investigate harassment complaints promptly and thoroughly, make a determination, take corrective action as needed, and protect the complainant in the interim.  Based on this illegal policy, school officials responded to sexual harassment complaints against CJC in clearly unreasonable ways.  They failed to investigate CJC's repeated harassment of multiple female students, imposed minimal and ineffective discipline on CJC for some of his many infractions, and failed to take precautionary measures to prevent further harassment, thereby subjecting female students to a hostile environment that interfered with their educational opportunities.  Indeed, when BHJ complained about CJC's harassing her to have sex with him in the bathroom, Simpson—with tacit approval from Dunaway—directed BHJ to meet CJC in the bathroom in order to catch him in the act so he could be punished pursuant to school policy.  This clearly unreasonable plan by school officials led to CJC raping BHJ.

The School Board is liable for damages under Title IX because school officials with authority to take corrective action had actual notice of the risk of

abuse by CJC and responded with deliberate indifference, leading to BHJ's rape, which constitutes hostile environment harassment. The Board is also liable under the Equal Protection Clause because Blair was acting as a final policymaker when he implemented the "catch in the act" policy that resulted in deliberate indifference to BHJ's plight, and because it failed to train school personnel on addressing peer sexual harassment in light of the obvious risk of inadequate responses.

The Individual Defendants are liable under Section 1983 for violating the Equal Protection Clause because of their unreasonable responses to known sexual harassment by CJC. Simpson is also liable under Section 1983 for violating the Substantive Due Process Clause because she intentionally subjected BHJ to being harmed when she arranged for BHJ to meet CJC in the bathroom to catch him in the act of sexual harassment.

Blair is liable under state law for Negligence and Wantonness because he failed to train Simpson in how to address sexual harassment, failed to investigate many complaints of harassment against CJC, and failed to consider CJC's prior conduct when disciplining him. These actions violate Title IX and the U.S. Constitution and were in bad faith, and therefore Blair is not entitled to state-agent immunity. Simpson is liable under state law for Outrage because she convinced BHJ to subject herself to sexual harassment when she knew or should have known

of the risk of harm to BHJ, which constitutes outrageous conduct that led to BHJ's rape.

Finally, the District Court erred when it refused an adverse inference against Defendants based on the spoliation of critical records regarding CJC's long history of sexual harassment.

## V.    ARGUMENT AND CITATION OF AUTHORITY

### A. The School Board Violated Title IX Because It Was Deliberately Indifferent to Known Hostile Environment Harassment.

A school board is liable for damages under Title IX for peer sexual harassment when: (1) a school official with authority to take corrective action has actual notice sufficient to alert the official to the possibility of the plaintiff's harassment; (2) plaintiff's harassment rises to the level of a hostile environment; and (3) the school official's response is deliberately indifferent—that is, clearly unreasonable under the circumstances. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1293 (11th Cir. 2007); *Doe v. Sch. Bd. of Broward County*, *Fla.* 604 F.3d 1248, 1254 (11th Cir. 2010).

The Department of Education's Office for Civil Rights, the primary federal agency that enforces Title IX, has issued guidance based on the Title IX regulations that requires schools to take immediate action to eliminate a hostile environment, prevent its recurrence, and address its effects. *See* 2001 Sexual

Harassment Guidance, *supra*, at 12; 2011 Sexual Violence Letter, *supra*, at 4-5. Regardless of whether there are any witnesses, evidence or admissions of harassment, schools must investigate complaints promptly, thoroughly, and fairly; make a determination; and take corrective action as needed. An investigation typically includes weighing the credibility of the parties and evaluating evidence of past complaints against the alleged harasser, which may support the credibility of the complainant. Schools must also take interim measures to protect complainants while an investigation is ongoing. 2001 Sexual Harassment Guidance, *supra,* at 5-17.

School officials clearly failed to follow these guidelines. Even though illegal policies encouraged officials to bury their heads in the sand with respect to past harassment complaints, appropriate school officials had actual notice of CJC's extensive history of sexual harassment and the risk of abuse by him. Despite this knowledge, they continued responding to allegations of harassment by CJC in clearly unreasonable ways—including by failing to investigate complaints against him and imposing ineffective discipline. These actions exacerbated the hostile environment faced by female students, including BHJ. After receiving BHJ's harassment complaint, school officials again responded with deliberate indifference. They failed to investigate and protect BHJ, and instead directed her to meet CJC in the bathroom to catch him in the act so that he could be punished.

School officials affirmatively put BHJ in danger and are liable for her rape, which is clearly hostile environment sexual harassment.

### 1. Appropriate School Officials Had Actual Notice of Sexual Harassment.

The District Court erred in holding that the School Board did not have sufficient notice to be liable for BHJ's rape. The Court applied the wrong legal standard in holding that school officials must have had notice of prior harassment by CJC that was severe, pervasive and interfered with female students' ability to benefit from their education. Rather, as this Court's precedents make clear, the School Board had **actual notice** because appropriate officials knew of: (1) a substantial risk of sexual assault of BHJ based on CJC's past history of sexual harassment, and (2) the plan to send BHJ into the bathroom to meet CJC pursuant to the "catch in the act" policy, which led to her being raped.

This Court has held that a principal is an "appropriate person" for actual notice purposes, and that a school board has actual notice sufficient to alert it to the possibility of a plaintiff's sexual assault where the principal knew of lesser harassment charges by other students against the same perpetrator. *See Doe*, 604 F.3d at 1255-59 ("[L]esser harassment may still provide actual notice of sexually violent conduct, for it is the risk of such conduct that the Title IX recipient has the duty to deter."). As this Court explained:

> [N]o Circuit has interpreted *Gebser*'s actual notice requirement so as to require notice of the prior harassment of the Title IX plaintiff *herself*. Notably, we have held in a Title IX student-on-student harassment case that the plaintiff sufficiently alleged actual notice where the primary substance of that notice differed significantly from the circumstances of the plaintiff's harassment.

*Id.* at 1257-58 (citations omitted). Accordingly, this Court has held that a school had actual notice of a plaintiff's rape based on its knowledge of the perpetrator's past misconduct at other schools. *Williams*, 477 F.3d at 1258-59.

Under this precedent, the School Board had actual notice. The District Court acknowledged that Principal Blair and Assistant Principals Dunaway and Terrell were aware of CJC's history of misconduct, *Hill*, 957 F. Supp. 2d at 1333, which included several "proven" instances of sexual harassment and violent threats (Doc. 87-4 & Doc. 87-5 Exs. 6-7; Doc. 87-9 Ex. 11). In addition, these officials admitted receiving other complaints of sexual harassment against CJC. (Doc. 87-2, pg. 41:16-42:12; Doc. 87-8, pg. 146:9-21; Doc. 87-7, pg. 21:23-22:7; Doc. 87-9, pg. 133:12-20.) This history is sufficient to put the School Board on notice of a risk of abuse by CJC.

The District Court's statement that the infractions in CJC's disciplinary record were not "so clear or substantiated as to reasonably put the school administrators on notice that CJC was involved in serious or pervasive harassment," *Hill*, 957 F. Supp. 2d at 1333, is particularly troubling given that the school's own policies were responsible for this circular situation. The policies of

throwing away documents related to sexual harassment complaints not "proven" by a witness, physical evidence, or admission (Doc. 87-8, pg. 48:12-49:18, 57:15-58:14) and of destroying student disciplinary records at the end of each year (Doc. 87-2, pg. 24:17-25:11, 26:7-13) allowed officials to bury their heads in the sand about patterns of harassment. These policies ensured that many allegations would never be substantiated because they were never properly investigated, in violation of Title IX. *See Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1248 (10th Cir. 1999) (holding that principal's refusal to investigate known claims of sexual assault amounts to deliberate indifference); 2001 Sexual Harassment Guidance, *supra*, at 15 (requiring schools to conduct prompt, thorough and fair investigations); 2011 Sexual Violence Letter, *supra*, at 2 (same).

The School Board also had actual notice because appropriate officials had knowledge of the plan to send BHJ into the bathroom, which subjected her to sexual harassment and violence. The District Court acknowledged that Dunaway was an appropriate official with authority to take corrective action, and that the evidence viewed favorably to Plaintiff establishes she was aware of the plan to use BHJ as bait in a sting operation to catch CJC. Yet remarkably, the Court held that "[t]here is no evidence other than that Dunaway understood this to be an isolated event of harassment involving BHJ, insufficient to create any Title IX actual knowledge of severe harassment." *Hill*, 957 F. Supp. 2d at 1334. In so holding,

the District Court not only applied the incorrect legal standard, as discussed above, but also misapplied that incorrect standard because Dunaway clearly had knowledge of a plan that subjected BHJ to a high risk of sexual assault, which is severe harassment. *See infra* Section V.A.2.

Teacher's Aide Simpson was a school official with authority to take corrective action who had **actual notice** of CJC's harassment of BHJ. *See, e.g.*, *Murrell.*, 186 F.3d   at1248   (accepting as true allegation that teachers were appropriate officials under Title IX); *Jones v. Indiana Area Sch. Dist.*, 397 F. Supp. 2d 628, 643-44 (W.D. Pa. 2005) (noting that teachers could be appropriate officials); *Montgomery v. Indep. Sch. Dist. No. 709*, 109 F. Supp. 2d 1081, 1099 (D. Minn. 2000) (rejecting argument that knowledge of harassment by teachers was insufficient because it was reasonable to infer they had authority to institute corrective measures to end peer harassment and school district's policy imposed upon them a duty to convey reports of harassment to the principal).  Simpson was designated by School Board policy as a person to whom complaints of sexual harassment could be made.  (Doc. 87-2, pg. 23:19-24:16, 26:14-19; Doc. 87-4 Exs. 4-5; Doc. 87-9, pg. 63:3-65:12.)  Simpson knew about the ongoing harassment of BHJ, as well as other instances of harassment by CJC.  (Doc. 93-1 ¶¶ 4-5; Doc. 87-1, pg. 54:3-9.)  She told Blair about other complaints of harassment by CJC and was informed he would have to be caught in the act.  (Doc. 93-1 ¶ 4.)  She clearly

had authority to take corrective action, as she devised the plan to use BHJ as bait to catch CJC, and apprised Dunaway of it.  (Doc. 93-1 ¶¶ 4-8; Doc. 87-1, pg. 61:8-20.).

### 2.  BHJ's Rape Clearly Constitutes Hostile Environment Harassment.

The District Court erred in holding that CJC's rape of BHJ did not constitute hostile environment sexual harassment.  Hostile environment harassment is harassment that is severe, pervasive and objectively offensive such that it has a concrete, negative effect on the victim's ability to receive an education.  *See Davis*, 526 U.S. at 653 (describing verbal harassment and offensive touching of plaintiff and other girls over several months as sufficient evidence of actionable sexual harassment); *Williams*, 477 F.3d at 1297-98.  A single incident of sexual assault can create a hostile environment.[10]  *See Williams*, 477 F.3d at 1297-98 (holding that gang rape of college student by fellow students constitutes actionable harassment); *Jennings v. Univ. of N.C.*, 444 F.3d 255, 268, 274 n.12 (4th Cir. 2006) (acknowledging that, while not at issue, single incident of sexual assault or rape could be sufficient to raise jury question about existence of hostile environment); *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 259 n.4 (6th Cir. 2000) ("Within the context of Title IX, a student's claim of hostile

---

[10] The District Court's reliance on *Hawkins v. Sarasota County School Board*, 322 F.3d 1279 (11th Cir. 2003), is misplaced.  That case did not involve allegations of rape, and hinged on the fact that despite severe, pervasive and objectively offensive comments and touching, the record reflected no concrete, negative effect on the female students' ability to receive an education.  *Id.* at 1289.

environment can arise from a single incident.") (internal quotation omitted); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (stating that rape and sexual abuse "obviously qualif[y] as . . . severe, pervasive, and objectively offensive sexual harassment"); 2001 Sexual Harassment Guidance, *supra,* at 5-7 (noting that single or isolated incident of harassment, if sufficiently severe, may create hostile environment).

The District Court also erred by not considering as relevant to the hostile environment analysis the severe and pervasive nature of CJC's harassment of female students over time (including pressuring BHJ to have sex with him for two weeks prior to raping her).  In the months and year leading up to the rape, CJC harassed multiple female students—inappropriately touching them, threatening violence against them, and propositioning them for sex.  These facts demonstrate the existence of a longstanding, hostile environment that interfered with BHJ's and other female students' ability to benefit from their education.  *See Jennings*, 482 F.3d at 695 (holding that incidents of sexual harassment directed at other students are relevant to determining whether plaintiff was subjected to hostile environment). The District Court's statement that CJC's repeated inappropriate touching, comments, and requests for sex were merely examples of "sexual misconduct" and not "actual sexual harassment," *Hill*, 957 F. Supp. 2d at 1333-34, reveals a fundamental misunderstanding of the definition of sexual harassment and is wholly

unsupported by the law.[11]  CJC's actions clearly fall within the Supreme Court's definition of actionable hostile environment sexual harassment.  *See Davis*, 526 U.S. at 653.

Finally, the District Court erred in failing to even consider that the harassment and rape BHJ suffered denied her "equal access to [the school's] resources and opportunities."  *Davis*, 526 U.S. at 631.  After the rape, BHJ does not remember returning to SMS.  (Doc. 87-1, pg. 99:10-101:20.)  She was prescribed medication for depression, did not feel safe or trust anyone, and had to see a therapist; she missed school and her grades dropped; and she stopped certain extracurricular activities.  (Doc. 87-1, pg. 36:2-22, 99:23-100:7, 120:5-132:20.) BHJ was still under the care of a mental health professional at the time of her deposition.  (Doc. 87-1, pg. 130:6-131:18.)  Such evidence is more than sufficient to show that the discrimination BHJ suffered had a "concrete, negative effect on her . . . ability to receive an education."  *Davis*, 526 U.S. at 654; *see also Williams*, 477 F.3d at 1298 (holding as sufficient that "the discrimination in which [the school] engaged or . . . allowed to occur on campus caused [plaintiff] to withdraw and not return").

---

[11] The District Court's reliance on *Benefield v. Board of Trustees of University of Alabama*, 214 F. Supp. 2d 1212 (N.D. Ala. 2002), is misplaced.  In that case, the court held that a university was not deliberately indifferent to plaintiff's sexual harassment claim, which was based on her sexual activity with male students, because she twice denied such activity when asked by college officials.  *Id.* at 1223 ("The material fact that the plaintiff denied the behavior, alleged in plaintiff's complaint, distinguishes this case from other Title IX, peer on peer harassment cases.").

### 3. Appropriate School Officials Were Deliberately Indifferent to Known Sexual Harassment.

The District Court erred in holding that appropriate school officials were not deliberately indifferent to known sexual harassment. Deliberately indifference is defined as responding to known harassment in a way that is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. School officials here responded to known harassment in clearly unreasonable ways by: 1) failing to investigate complaints against CJC and discipline him for his ongoing harassment of female students; 2) failing to supervise CJC more closely in light of his history of harassment; 3) failing to train staff about the proper way to respond to complaints of sexual harassment; and 4) deciding to subject BHJ to sexual harassment pursuant to the "catch in the act" policy. These actions allowed CJC's harassment to continue and escalate, culminating in the rape of BHJ.

First, Principal Blair and Assistant Principals Dunaway and Terrell had access to records of CJC's history of sexual harassment at his prior school, including an incident where CJC was disciplined for "touching girls in inappropriate places" and writing "inappropriate note [sic] to girls asking them to have sex with him." (Doc. 87-9, Ex. 11.) They were aware of CJC's repeated harassment of multiple female students over the course of a year at SMS, including propositioning girls for sex and threatening violence against a female student. (Doc. 87-9, pg. 133:12-20; Doc. 87-2, pg. 123:13-124:11; Doc. 87-4 Ex. 6.)

Yet school officials did not investigate complaints of harassment against CJC—brushing off complaints unless he was "caught in the act"—and continued to respond with minimal discipline that did not account for his recidivistic nature or curtail his conduct.  The law is clear that if a school's response to sexual harassment is ineffective, it must do more.  *See Doe*, 604 F.3d at 1261 ("[W]here a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior."); 2001 Sexual Harassment Guidance, *supra*, at 12-13.

Second, as the Code of Conduct details and school officials admitted, the extensive number of CJC's infractions in such a tight time frame and their cumulative nature should have been taken into account when considering any disciplinary action.  (Doc. 87-2, pg. 164:6-21; Doc. 87-4 Ex. 4; Doc. 87-8, pg. 87:10-88:10.)  Yet CJC was repeatedly placed on in-school suspension, even though the Code of Conduct provides for greater punishment for repeated offenses and despite the fact that he continued to sexually harass female students, including while on in-school suspension.  (Doc. 87-4 & Doc. 87-5 Exs. 4, 6-7; Doc. 87-1, pg. 55:5-56:8.)  The decisions by school officials to use the same punishment were clearly unreasonable in light of CJC's recidivism.  *See Doe*, 604 F.3d at 1263 (holding that plaintiff produced evidence of deliberate indifference where principal conducted minimal investigation of harassment complaints against teacher but

ignored the pattern created by lesser complaints and plaintiff was ultimately sexually assaulted by teacher).

In addition, despite CJC's known history, school officials failed to supervise him closely to protect the female students. Instead, they took the opposite course and allowed CJC to roam the halls unsupervised during in-school suspension, including on the day of, and those leading up to, BHJ's assault. (Doc. 87-2, pg. 152:14-154:4.) Even after Teacher's Aide Simpson had reported in January 2010 that CJC was propositioning girls to have sex with him in the bathroom (Doc. 93-1 ¶ 4), Blair did not take the precautionary measure of supervising CJC closely to ensure no further harassment of female students. *See Doe*, 604 F.3d at 1262 ("[W]e have repeatedly recognized that a school district's reasonable response to sexual harassment may include corrective action such as monitoring and admonishing an accused teacher or student despite the inconclusive nature of the school's investigation into the misconduct."); *see also* 2001 Sexual Harassment Guidance, *supra*, at 15-16 (stating that once student complains of sexual harassment, school must conduct prompt and thorough investigation and may need to take interim measures during investigation to ensure no contact or further harassment). Allowing a student with CJC's history of known harassment to be unsupervised was clearly unreasonable in light of the known circumstances. *See Williams*, 477 F.3d at 1296 (holding that school was deliberately indifferent for

failing to adequately supervise student with history of sexual misconduct who then raped plaintiff).

Third, the School Board is liable because its officials were deliberately indifferent to the obvious need to train staff about their legal obligations to address complaints of sexual harassment. *See Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007) ("We conclude that a funding recipient can be said to have 'intentionally acted in clear violation of Title IX' when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient.") (quoting *Davis*, 526 U.S. at 642); *see also* 34 C.F.R. §§ 106.9, 106.8a-b; 2001 Sexual Harassment Guidance, *supra*, at 19-21 (describing requirements for schools to have Title IX grievance procedures and to provide  training to school community).  A need for training might be obvious because of knowledge of previous incidents of sexual harassment or because employees are likely to face recurring situations involving sexual harassment given the realities of the school environment. *See Simpson*, 500 F.3d at 1178-79.

Hence, The School Board designated all school employees as appropriate officials to receive complaints of peer sexual harassment, but provided no training to those employees about how to properly investigate and respond to such

complaints.  Simpson repeatedly asked Blair for proper training on handling complaints of sexual harassment, but received none and was instead told to follow a "catch in the act" policy.  (Doc. 93-1 ¶¶ 17-18.)  BHJ's injuries were thus caused by the School Board's official policy of deliberate indifference to the obvious need for training its employees in how to respond to sexual harassment complaints.  *See Simpson,* 500 F.3d at 1184-85.

But the most shocking evidence of the School Board's deliberate indifference is that school officials charged with protecting BHJ from sexual harassment caused her to undergo sexual harassment by arranging for her to meet CJC in the bathroom, where he raped her.  (Doc. 93-1 ¶¶ 5, 7-8.)  Instead of properly investigating and addressing complaints of harassment by CJC and supervising him closely, school officials told BHJ that the only way to make the harassment stop was to catch CJC in the act and instructed her to meet CJC in the bathroom.  (Doc. 93-1 ¶ 5; Doc. 87-1, pg. 61:8-23.)  The school's illegal "catch in the act" policy for handling sexual harassment complaints and the unreasonable response to the prior claims against CJC (including BHJ's), coupled with their utter disregard for BHJ's safety in sending her to meet CJC, led to BHJ's rape.  It is hard to imagine actions that are more clearly unreasonable under the circumstances.  *See Williams*, 477 F.3d at 1296 (holding that school's "failure to inform its student-athletes about the applicable sexual harassment policy and failure to supervise its

student-athletes subjected [plaintiff] to . . . harassment and caused . . . [male students] to sexually assault and rape her").

Even the response to BHJ's rape shows that school officials continued to act in ways that were clearly unreasonable. While she was on her way to Blair's office after being raped, Terrell told BHJ that she would probably be suspended. (Doc. 87-8, pg. 153:14-154:6.) Making this statement to BHJ, who was already traumatized after being raped because she followed a school-devised plan to try to stop CJC from harassing her, was plainly unreasonable under the circumstances. The only other evidence Plaintiff has about officials' response to BHJ's rape is that CJC was suspended for five days and ultimately placed in an alternative school. (Doc. 87-2, pg. 67:9-14, 95:15-19.)

Dunaway testified that SMS is still implementing its illegal policies and procedures for investigating and responding to sexual harassment complaints. (Doc. 87-7, pg. 18:13-19:3.) *See Williams,* 477 F.3d at 1297 (holding that plaintiff's decision to withdraw from school was reasonable and did not foreclose her argument that school continued to subject her to discrimination because school failed to take precautions to prevent future attacks, such as implementing a more protective sexual harassment policy).

The District Court erroneously justified its holding of no deliberate indifference by making two irrelevant findings and not interpreting the evidence in

the light most favorable to Plaintiff.  First, the District Court asserted that school officials did not intend to subject BHJ to sexual harassment or assault.  *Hill*, 957 F. Supp. 2d at 1334.  This statement ignores that motive is **irrelevant** under the deliberate indifference standard; the only question is whether the school's actions were clearly unreasonable under the circumstances.[12]  *See Davis*, 526 U.S. at 648-54; *Williams*, 477 F.3d at 1295-97.  In any event, school officials did intend to subject BHJ to some level of sexual harassment because it was a necessary element of the plan to catch CJC in the act of harassment.

Second, the District Court repeatedly characterized BHJ as a "willing" participant in the plan to catch CJC—as though even if this were true it would somehow make the plan reasonable.  Not only is this characterization of BHJ contradicted by the evidence, which must be viewed in the light most favorable to Plaintiff, but it reveals a fundamental lack of understanding of the power dynamic inherent in the teacher-student relationship.  This fourteen-year-old, special education student did not want to meet CJC in the bathroom, but was told by her teacher that it was the only way to make the harassment stop pursuant to the

---

[12] In disparate treatment cases intent is established by the discriminatory action itself, regardless of motive.  *See United Auto Workers v. Johnson Controls*, 499 U.S. 187, 199-200 (1991) (holding that "[w]hether an employment practice involves disparate treatment . . . does not depend on why the employer discriminates" and that employer's benevolent motive does not alter that conclusion); *Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir. 1993) ("Discriminatory intent may be found 'even where the record contains no direct evidence of bad faith, ill will or any evil motive on the part of public officials.'") (internal citation omitted).

school's "catch in the act" policy. (Doc. 87-1, pg. 60:16-61:23, 140:23-142:5; Doc. 93-1 ¶¶ 5-6.) Given the control teachers exercise over students and the authority vested in them to address peer harassment, relying on BHJ's acquiescence to the plan to excuse the unreasonableness of the plan itself only adds insult to injury.[13] *Cf.* 2001 Sexual Harassment Guidance, *supra*, at 8 (discussing how school employees' position of authority may lead students to not voice objections to harassment).

## B. Defendants Are Liable under 42 U.S.C. § 1983 for Violating BHJ's Right to Equal Protection.

The School Board and Individual Defendants who are or were employees of the Board are liable under 42 U.S.C. § 1983 for depriving BHJ of her rights under the Fourteenth Amendment's Equal Protection Clause. *See Monell v. Dep't of Soc. Services of City of N.Y.*, 436 U.S. 658, 690 (1978); *West v. Atkins*, 487 U.S. 42, 49-50 (1988); *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996-97 (11th Cir. 1990). Sexual harassment is a form of unlawful sex discrimination that can violate the Equal Protection Clause. *See Cross v. State of Ala., State Dep't of*

---

[13] To the extent the District Court was making a statement about welcomeness, BHJ clearly did not welcome CJC's conduct, which is why she complained about it and was reluctant to meet him in the bathroom. *See Does v. Covington Sch. Bd. of Educ.*, 930 F. Supp. 554, 569 (M.D. Ala. 1996) (describing conduct as unwelcome if the student did not request or invite it and "regarded the conduct as undesirable or offensive"); 2001 Sexual Harassment Guidance, *supra*, at 8 ("The fact that a student may have accepted the conduct does not mean that he or she welcomed it."); *cf. Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) ("[T]he fact that sex-related conduct was 'voluntary' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII.").

*Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995); *see also Murrell*, 186 F.3d at 1249-51.  The Supreme Court has held that a student can assert a Section 1983 cause of action for sex discrimination in school in violation of the Equal Protection Clause separate and apart from any Title IX cause of action.  *See Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246, 256-58 (2008).

Defendants are liable for violating BHJ's right to be free from sex discrimination under the Equal Protection Clause because their horribly-inadequate response to known peer sexual harassment by CJC led to BHJ's rape.  *See Murrell*, 186 F.3d at 1249-50 (holding that school districts and school officials can be liable for deliberate indifference to peer sexual harassment); *see also Shively v. Green Local Sch. Dist. Bd. of Educ.*, No. 13-3423, 2014 WL 4211100, at *7 (6th Cir. Aug. 27, 2014) (stating that school officials can be liable for deliberate indifference to allegations of peer gender- and religion-based harassment); *DiStiso v. Cook*, 691 F.3d 226, 240-41 (2d Cir. 2012) (stating that claim of race discrimination can be based on deliberate indifference of school boards, administrators and teachers to peer racial harassment); *Flores v. Morgan Hill Unified Sch. Dist*., 324 F.3d 1130, 1134-35 (9th Cir. 2003) (stating that school administrators can be liable for responding to known peer harassment based on sexual orientation in a clearly unreasonable manner).

### 1. The School Board Deprived BHJ of Her Equal Protection Right to be Free from Sex Discrimination.

A school board is liable under Section 1983 for violation of an individual's right to equal protection if the violation results from an official policy of the board, from the actions of an official that is fairly deemed to represent government policy, or from a pervasive and well-settled custom or practice. *Doe*, 604 F.3d at 1263. "A plaintiff alleging . . . liability under § 1983 must show that . . . the municipal action was taken with the requisite degree of culpability, i.e., that the municipal action was taken with deliberate indifference to its known or obvious consequences." *Id*. (internal quotation omitted). In addition, a school board's failure to supervise or train its employees can form the basis for Section 1983 liability, if the failure to train evidences deliberate indifference to constitutional rights. *Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 568 (11th Cir. 1997).

### a. The School Board violated BHJ's equal protection rights because Principal Blair's sexual harassment policy was deliberately indifferent to the obvious risk of further harassment and caused BHJ's rape.

In holding the School Board not liable for violating BHJ's equal protection rights, the District Court overlooked the well-settled principle that a school board can be liable for actions or decisions of its officials who are imbued with final policymaking authority for the issue at hand. *See Doe*, 604 F.3d at 1263-64; *see also Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) ("A [government]

39

policy is a decision that is officially adopted by the municipality, *or* created by an official of such rank that he or she could be said to be acting on behalf of the municipality.") (emphasis added) (internal quotation omitted).  Principal Blair's policy was to discipline students for sexual harassment only if they were "caught in the act" by a witness, physical evidence, or admission by the accused harasser, and otherwise records reflecting reports of harassment were discarded.  (Doc. 87-2, pg. 53:16-54:8; Doc. 87-8, pg. 48:12-50:23; Doc. 87-7, pg. 17:20-19:3, 36:6-40:21; Doc. 93-1 ¶ 4.)  Following this policy allowed CJC to continue his pattern of sexual harassment on school grounds until he raped BHJ.  (Doc. 87-2, pg. 30:6-35:17, 40:3-46:13, 154:2-18; Doc. 87-8, pg. 144:16-147:10, 196:16-198:5; Doc. 87-7, pg. 36:6-40:21; Doc. 93-1 ¶ 4.)  In addition, BHJ's rape occurred in the course of an attempt by Teacher's Aide Simpson—with tacit approval of Assistant Principal Dunaway—to implement this policy by using BHJ as bait to catch CJC in the act of harassment.  (Doc. 93-1 ¶¶ 5-8, 18; Doc. 87-1, pg. 61:8-20.)

Blair's decisions regarding how to handle complaints of peer sexual harassment were not subject to meaningful review by the School Board.  Rather, School Board policy placed responsibility for investigating and responding to sexual harassment complaints with principals.  (Doc. 87-2, pg. 109:1-5; Doc. 87-4 Exs. 4-5.)  Blair therefore was exercising final policymaking authority for purposes of the School Board's liability under Section 1983 when he established the "catch

in the act" policy. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1292-93 (11th Cir. 2004) (holding that school principal was final policymaker when there was no opportunity for meaningful review of his disciplinary decisions by School Board); *Smith ex rel. Lanham v. Greene County Sch. Dist.*, 100 F. Supp. 2d 1354, 1361 (M.D. Ga. 2000) (holding that school principal was final policymaker when district authorized her to impose disciplinary action without any formal system of review); *Godby v. Montgomery County Bd. of Educ.*, 996 F. Supp. 1390, 1405-1406 (M.D. Ala. 1998) (denying summary judgment because of question of material fact whether principal was final policymaker because he was given unfettered authority to run extracurricular activities at school).[14]

The "catch in the act" policy, attributable to the School Board, was adopted and implemented with deliberate indifference to its obvious consequences in terms of the potential for further harassment. School officials pursuing this policy failed to address a known pattern of sexual harassment by CJC and ultimately created the obvious and virtually certain risk that CJC would engage in additional harassment of BHJ. Following this policy was therefore clearly unreasonable in light of the known circumstances. *See DiStiso*, 691 F.3d at 240-41 (articulating deliberate indifference standard in peer harassment cases under the Equal Protection Clause).

---

[14] This case therefore differs from others where a school principal was held not to be a final policymaker for purposes of the school board's liability under Section 1983. *See, e.g., Doe*, 604 F.3d at 1265 (holding that principal was not final policymaker when he only had the authority to make recommendation to superior that superior was free to accept or reject).

**b. The School Board violated BHJ's equal protection rights because its failure to train its employees on addressing sexual harassment complaints was deliberately indifferent to the risk of future harassment and led to BHJ's rape.**

The School Board's sexual harassment policy designated all school employees as proper officials to whom complaints of peer harassment could be made. (Doc. 87-2, pg. 23:19-24:16, 26:14-19; Doc. 87-4 Exs. 4-5; Doc. 87-9, pg. 63:3-65:12.) But the Board did not train these employees about how to properly respond to complaints of sexual harassment. (Doc. 87-8, pg. 51:1-15, 66:2-17; Doc. 93-1 ¶ 17.) Teacher's Aide Simpson made repeated requests for training on how to handle harassment complaints, but instead of receiving such training she was told to follow the "catch in the act" policy (Doc. 93-1 ¶¶ 17-18), a policy plainly inconsistent with Title IX obligations. *See supra* Section V.A. Simpson—with tacit approval of Assistant Principal Dunaway—was acting in furtherance of this illegal policy when she arranged for BHJ to meet CJC in the bathroom, which led to BHJ's rape.

The School Board was deliberately indifferent in its failure to train school employees on how to handle peer sexual harassment complaints because it knew of the need for such training and chose not to take action. *See Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). The likelihood of unlawful responses to incidents of peer sexual harassment in the absence of such training was highly predictable. *See id.* at 1352. This obvious risk is the reason why such training is

considered an essential element of compliance with Title IX.  *See* 2001 Sexual Harassment Guidance, *supra*, at 13, 21; 2010 Sexual Violence Letter, *supra*, at 4, 12.

## 2. The Individual Defendants Deprived BHJ of Her Equal Protection Right to be Free from Sex Discrimination and Are Not Entitled to Qualified Immunity.

The Individual Defendants deprived BHJ of her equal protection right to be free from sex discrimination by their unreasonable response to known sexual harassment by CJC.  *See, e.g.*, *Murrell*, 186 F.3d at 1250.  Principal Blair and Assistant Principals Terrell and Dunaway knew of CJC's pattern of sexual harassment, but because they implemented the "catch in the act" policy, complaints against CJC were never investigated, he was only minimally reprimanded, and BHJ was roped into a plan to finally catch CJC in the act of harassment, which led to her being raped.  (Doc. 87-2, pg. 30:6-35:17, 40:3-46:13, 154:2-18; Doc. 87-8, pg. 144:16-147:10, 196:16-198:5; Doc. 87-7, pg. 36:6-40:21; Doc. 93-1 ¶ 4.)  Teacher's Aide Simpson knew about CJC's sexual harassment of BHJ and other students, and asked BHJ to meet CJC in the bathroom so he could be punished—with Dunaway's tacit approval.  (Doc. 93-1 ¶¶ 4-5, 7-8; Doc. 87-1, pg. 54:3-9, 60:16-61:20.)  The Individual Defendants thus unreasonably failed to address CJC's known pattern of sexual harassment against BHJ and other female students

and instead chose a course of action that made it a near certainty that BHJ would experience further harassment by CJC.[15]

Further, the Individual Defendants are not entitled to qualified immunity on Plaintiff's equal protection claim. In ruling to the contrary, the District Court failed to apply the correct legal standard. Plaintiff does not have to point to a prior court decision where the facts are fundamentally similar in order to prove that Defendants violated BHJ's clearly established constitutional rights. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Id.* (internal quotations omitted).

It has been long established in this Circuit that a public official can be liable under Section 1983 for depriving a person of her constitutional right to be free from sexual harassment when the official has notice of repeated sexual harassment by a person over whom he or she has supervisory authority and does not take action to correct the situation. *See Cross*, 49 F.3d at 1507-1508. The Tenth Circuit has recognized that this Section 1983 liability of public officials exercising supervisory authority for deliberate indifference to sexual harassment by their

---

[15] Whether some or all of the Defendants actually intended BHJ to be raped by CJC is not relevant. Plaintiff does not need to prove that Defendants fully appreciated the harmful consequences of their actions. *See Shively*, 2014 WL 4211100, at *7. The actions of Defendants were clearly unreasonable under the known circumstances, and therefore Defendants were deliberately indifferent to BHJ's plight.

subordinates extends to principals or teachers who know of sexual harassment by a student and acquiesce in that conduct by refusing to reasonably respond to it. *See Murrell*, 186 F.3d at 1250.

In *Cross*, this Court held that the record was sufficient to support Section 1983 liability against a defendant who was aware of multiple complaints of sexual harassment against the same subordinate, both by the plaintiffs and other women, and began an investigation but then decided to drop it and await further misconduct by the harasser. 49 F.3d at 1495-96, 1508. Other Courts of Appeal have further fleshed out when a school official's deficient response to peer harassment can subject that official to Section 1983 liability for denying the plaintiff equal protection. *See Flores*, 324 F.3d at 1135-36 (the 9th Circuit finding sufficient evidence of deliberate indifference by defendants who failed to investigate sexual orientation harassment complaints, discipline those accused of harassment, and/or take further action in light of knowledge that previous remedial steps were inadequate); *Murrell*, 186 F.3d at 1243-44, 1250-51 (the 10th Circuit holding that defendants who failed to supervise student with known history of inappropriate sexual behavior and to take adequate action in response to his sexual assaults of plaintiff could be liable).

In light of these clearly-established principles, objectively-reasonable school officials in the position of Defendants here had fair warning that failing to

adequately respond to repeated complaints of sexual harassment by a male student, and then using a female student as bait to catch him in the act of harassment so he can be punished, would deprive the female student of her constitutional rights. It should not and does not matter whether or not there have been prior decisions holding that it is unlawful for school officials to expose a student to sexual harassment in this way. It is easily apparent that such conduct falls within the realm of a highly-unreasonable response to a known pattern of sexual harassment.[16]

## C. Defendant Simpson is Liable under 42 U.S.C. § 1983 for Violating BHJ's Right to Substantive Due Process.

Plaintiff also has a cause of action against Teacher's Aide Simpson under 42 U.S.C. § 1983 for deprivation of BHJ's Fourteenth Amendment substantive due process right under color of state law. *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990). This includes the right to be free from sexually-motivated assaults. *Thomas v. City of Clanton*, 285 F. Supp. 2d 1275, 1280-81 (M.D. Ala. 2003).

---

[16] This Court's holding in *Williams v. Board of Regents University System of Georgia* that school officials were qualifiedly immune from liability on Equal Protection Clause claims does not help Defendants. This Court in *Williams* just made the conclusory statement that the plaintiff had not presented any cases showing a violation of her clearly established equal protection rights by the recruitment and admission of an individual with a history of criminal and disciplinary problems. 477 F.3d at 1301. This Court therefore made no statement one way or the other as to whether the conduct of the school officials violated the Equal Protection Clause. *See Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1307-08 (11th Cir. 2005) (stating that prior decision of Court granting qualified immunity did "not resolve the issue of whether the law was clearly established because [the decision] declined to make a finding of constitutional violation *vel non*"). In addition, the Court in *Williams* was not called upon to consider whether conduct by school officials that leads to the virtually certain exposure of a specific female student to sexual harassment violates her equal protection rights.

State actors are liable for substantive due process violations if their acts are "arbitrary or conscience shocking." *Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003). Plaintiff acknowledges that this Court has indicated that in cases arising in the school context, deliberate indifference is not a basis for finding substantive due process liability for "conscience shocking" conduct. *See Davis v. Carter*, 555 F.3d 979, 983 (11th Cir. 2009) (quoting *Nix v. Franklin County Sch. Dist.*, 311 F.3d 1373 (11th Cir. 2002). Plaintiff respectfully submits that this approach misapplies Supreme Court precedent.

The Supreme Court has made it clear that deliberate indifference can shock the conscience, and that a deliberate indifference standard is sensibly applied to situations where it is possible for officials to engage in deliberate decision-making. *See County of Sacramento v. Lewis*, 523 U.S. 833, 850-51 (1998). Dealing with a known pattern of sexual harassment by a public school student is just one such situation. *See Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1238-41 (10th Cir. 1999) (applying recklessness and/or deliberate indifference standard to school official's actions to deal with alleged peer sexual assault). *Cf. Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654-56 (7th Cir. 2011) (applying deliberate indifference standard to school official decisions about student transfer); *Patrick v. Great Valley Sch. Dist.*, 296 F. App'x 258, 261 (3d Cir. 2008) (applying

deliberate indifference standard to school official's decisions about athletic practice).

In any event, Simpson intended that BHJ experience harm in the form of, at a minimum, further unwanted sexual advances, because this was a necessary element of the plan to catch CJC in the act of harassment.  Therefore, Simpson's conduct went beyond deliberate indifference and involved intentional actions putting BHJ in harm's way, which should subject Simpson to liability for a substantive due process violation.  *See Davis*, 555 F.3d at 984 (rejecting substantive due process claim because allegations did not "support a finding that [defendants] acted willfully or maliciously with an intent to injure [the plaintiff]" but only alleged "deliberate indifference, *without more*") (emphasis added); *see also Neal ex rel. Neal v. Fulton County Bd. of Educ*., 229 F.3d 1069, 1076 (11th Cir. 2000) (holding that student alleged substantive due process claim in corporal punishment case based on school official's intentional use of obviously-excessive amount of force that presented reasonably-foreseeable risk of serious injury).

Simpson is not entitled to qualified immunity on Plaintiff's substantive due process claim because it was clearly established at the time of the events giving rise to this case that a school official could be liable for willful actions intended to cause some injury.  *See Davis*, 555 F.3d at 984.  Simpson therefore had fair warning that intentionally subjecting BHJ to further sexual harassment by

arranging for her to meet CJC in the bathroom to catch him in the act of harassment would violate her constitutional rights.

### D. Defendant Blair is not Immune as an Agent of the State of Alabama on Plaintiff's Negligence and Wantonness Claims.

The District Court erred in holding that Principal Blair is entitled to state-agent immunity on Plaintiff's claims of Negligence and Wantonness.  Blair wantonly and negligently failed to train Simpson regarding investigating sexual harassment complaints, failed to investigate multiple complaints of sexual assault and harassment against CJC as required by the law, and failed to consider CJC's prior conduct when disciplining him.  Blair's negligent and wanton acts directly resulted in the rape of BHJ by CJC, and he is not immune from responsibility under state law.

As correctly noted by the District Court, notwithstanding state law immunity for officials exercising discretionary functions associated with educating children, a State agent shall not be immune from civil liability in his personal capacity "when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."  *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).

To claim immunity, a State agent bears the initial burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity.  *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003); *Ex parte*

*Wood*, 852 So. 2d 705, 709 (Ala. 2002).  If the State agent succeeds, the burden shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority.  *Giambrone*, 874 So. 2d at 1052; *Wood*, 852 So. 2d at 709; *Ex parte Davis*, 721 So. 2d 685, 689 (Ala. 1998).  A State agent acts beyond authority when he/she fails to discharge duties pursuant to detailed rules or regulations.  *Giambrone*, 874 So. 2d at 1052 (*quoting Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000)).

Blair acted beyond his authority by failing to comply with his clear obligation to take immediate action to eliminate sexual harassment, prevent its recurrence, and address its effects under detailed Title IX rules and regulations. *See, e.g.*, 2001 Sexual Harassment Guidance, *supra*; 2011 Sexual Violence Letter, *supra*.  As a school official, Blair has an obligation to comply with Title IX, and he clearly failed to do so by not investigating many allegations of sexual harassment and by not taking effective action to stop CJC's ongoing sexual harassment of female students.   In effect, Blair's "investigations" were tantamount to no investigation at all; and Title IX clearly requires a prompt and thorough investigation.  *See Stack v. Stream*, 988 So. 2d 516, 527-31 (Ala. 2008) (holding that university professor was not entitled to qualified immunity where he failed to conduct proper investigation before accusing another professor of plagiarism, where detailed guidelines for investigating claim of plagiarism were not

followed);[17] *see also Giambrone*, 874 So. 2d at 1052-53 (holding that wrestling a student in violation of wrestling association's detailed safety guidelines resulted in no state-agent immunity); *C.C. v. Monroe County Bd. of Educ.*, 299 F. App'x 937, 942 (11th Cir. 2008) (upholding denial of state agent immunity where principal failed to investigate complaint of sexual harassment in compliance with detailed school policy requiring investigation of all sexual harassment complaints).

Blair acted in bad faith by failing to take CJC's recidivism into account when allowing him to be unsupervised during in-school suspension. A jury could find that Blair's knowledge of CJC's history of sexual harassment coupled with his conduct in refusing to properly discipline CJC and keep him away from the female student population he was continually harassing constitute "bad faith." This would be sufficient to warrant denial of state law immunity. *See Wright v. Wynn*, 682 So. 2d 1, 4 (Ala. 1996) (holding evidence that officer acted in bad faith during an arrest sufficient to create a jury question as to whether he was entitled to state law immunity)

Nevertheless, the District Court erroneously found that "one cannot debate that Blair . . . acted in good faith to investigate the complaints made about CJC, imposed reasonable discipline upon him, and otherwise control his behavior."

---

[17] To the extent Blair claims ignorance of Title IX's requirement of a prompt and thorough investigation, the Alabama Supreme Court has declined to extend state-agent immunity to individuals who are ignorant of the rules and regulations applicable to the agency with which they are employed. *Stack*, 988 So. 2d at 530.

*Hill*, 957 F. Supp. 2d at 1346.  To the contrary, Blair's implementation of sexual harassment policy involved nothing but cursory investigations that resulted in no punishment unless CJC was "caught in the act."  (Doc. 87-2, pg. 53:16-54:8, 48:12-50:23, 17:12-18:7.)  The word of one girl—or even five girls reporting identical harassment – was  not "proven"[18] and did not lead to punishment, and Defendants destroyed all related documents.  (Doc. 87-8, pg. 49:5-18, 57:15-58:14.)  Effectively, complaints of sexual harassment by students were ignored, or only minimal and inadequate punishment resulted for harassment that was not "proven."  Rather than training Simpson to properly handle sexual harassment complaints, Blair instructed her that CJC could not be disciplined for sexual harassment unless he was "caught in the act."  (Doc. 93-1 ¶¶ 4, 17-18.)  Blair's bad faith actions allowed a serial harasser like CJC to wander the halls of the school unsupervised and to ultimately rape BHJ.  (Doc. 87-2, pg. 152:14-154:18.)  *See N.C. v. Caldwell*, 77 So. 3d 561, 569 (Ala. 2011) (holding that teacher acted beyond his authority and was not immune where girl was raped in the gym and teacher failed to report or investigate claims of harassment by other students prior to rape).

At the very minimum, Blair's failure to conduct investigations and take actions required by Title IX was based on a "mistaken interpretation" of that law

---

[18] Blair was aware other girls had complained about CJC asking them for sex.  (Doc. 87-9, pg. 133:12-20; Doc. 93-1 ¶ 4.)

and its requirements.  Under *Cranman*, a state official is not immune for action taken due to a "mistaken interpretation" of Title IX.  792 So. 2d at 405.  Blair's actions are tantamount to a complete failure to comply with his duties.

Blair is not entitled to state law immunity because his negligent and wanton actions were in violation of applicable federal law, in bad faith, and/or due to a mistaken interpretation of federal law.

### E. Defendant Simpson's Plan to Use BHJ as Bait to Catch CJC in the Act of Sexual Harassment, and Her Failure to Protect BHJ from Rape, is Outrageous Conduct.

The elements of the tort of Outrage are:

> (1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) the distress was severe.

*Scott v. Estes*, 60 F. Supp. 2d 1260, 1275 (M.D. Ala. 1999).

To recover on the claim of Outrage, Plaintiff must show that Teacher's Aide Simpson's conduct was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious in a civilized society."  *Harrelson v. R.J.*, 882 So. 2d 317, 322 (Ala. 2003).

Simpson consciously and purposely convinced BHJ to subject herself to unlawful sexual harassment that ultimately resulted in her rape.  (Doc. 93-1 ¶ 4.) Simpson "knew or should have known" of the substantial risk of harm to BHJ in

using her—a special education student—as bait in a sting operation to catch a known harasser. Further, this was sufficiently "extreme and outrageous conduct" to support an Outrage claim against Simpson. *See, e.g.*, *Harrelson*, 882 So. 2d at 322 (holding sexual assault on a minor sufficient to support jury verdict on Outrage claim).

The District Court noted that CJC's conduct was the "cause" of the harm to BHJ and the distress she suffered. *Hill v. Madison County Sch. Bd.*, No. 5:10-cv-02593, 2013 WL 5773855, at *13 (N.D. Ala. Oct. 24, 2013). However, Simpson's conduct in consciously sending BHJ to be subjected to sexual harassment that resulted directly in her rape sufficiently contributed to causing the rape and the resulting distress suffered by BHJ to support a claim for Outrage.

## F. The District Court Should Have Inferred that Destroyed Records of CJC's Multiple Disciplinary Matters Would Benefit Plaintiff.

Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009). This Circuit has applied the following factors to determine whether sanctions (such as a negative inference instruction to a jury, or even dismissal) are warranted when a party destroys evidence: "(1) whether the [moving party] was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; [and] (4) whether the

[non-moving party] acted in good faith." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945-46 (11th Cir. 2005).[19]    When deciding a motion for summary judgment, the District Court should take into account the fact that a negative inference instruction to a jury is warranted where a defendant has destroyed documents in bad faith. *See, e.g., Woodard v. Wal-Mart Stores*, 801 F. Supp. 2d 1363, 1378 (M.D. Ga. 2011) (denying defendants' motion for summary judgment, in part, because jury determination that defendant destroyed videotape in bad faith could lead to inference of defendant's actual or constructive knowledge of cause of plaintiff's injury).

Principal Blair, aware that CJC was the accused rapist, received a spoliation letter in early May 2010 requesting that "[a]ny videos or documents pertaining to" BHJ's rape be preserved.  (Doc. 87-2, pg. 144:19-145:8; Doc. 87-6 Ex. 12.) Subsequent to receiving this, Defendants intentionally destroyed all paper documents relating to CJC's disciplinary records.  (Doc. 87-8, pg. 139:12-144:15.) Blair and Assistant Principals Dunaway and Terrell now claim to remember almost nothing about the numerous instances of misconduct listed in CJC's disciplinary record.  Defendants' intentional destruction of essential records after receipt of a spoliation letter and their collective amnesia[20] regarding information that would

---

[19] The fifth factor addressed in *Flury,* regarding striking expert testimony, is not applicable here.
[20]  Defendants' complete lack of memory effectively prevents any possible "cure" to the prejudice resulting to Plaintiff due to the destruction of documents.  *See Woodard*, 801 F. Supp.

have been found in those records is evidence of conduct that was, at best, in bad

faith and more than sufficient to warrant an adverse inference. *See, e.g., Little v.*

*McClure*, No. 5:12-CV-147(MTT), 2014 WL 3778963, at *3 (M.D. Ga. July 31,

2014) (holding that destruction of cellular device after spoliation letter was

received by defendant deprived plaintiff of critical evidence to support an

inference, and noting "it is difficult to argue good faith when evidence is destroyed

after receiving such clear notice"). Thus, the District Court abused its discretion

when granting summary judgment to Defendants by failing to infer that: (1) CJC

was engaged in a long pattern of sexual harassment, intimidation and violence

against female students; (2) Defendants were aware of this pattern of sexual

misconduct and violence; and (3) Dunaway was aware of CJC's history of sexual

harassment when she heard of the plan to use BHJ as bait to catch CJC.

## VI.   CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the reasons stated above, Plaintiff respectfully requests that this Court

reverse the District Court's grant of summary judgment: (1) in favor of the School

Board on the Title IX and Equal Protection Clause claims, (2) in favor of Blair,

Dunaway, Terrell and Simpson under the Equal Protection Clause, (3) in favor of

Simpson under the Substantive Due Process Clause, (4) in favor of Blair on the

---

2d at 1373-75 (holding that sparse testimony regarding contents of relevant videotape "lost" by
defendant was insufficient to cure prejudice to plaintiff and jury should be instructed to consider
whether tape was destroyed in bad faith to warrant adverse inference).

state law claims of Negligence and Wantonness, and (5) in favor of Simpson on the state law claim of Outrage.  In addition, Plaintiff requests that this Court reverse the District Court's refusal to infer that CJC's disciplinary records would have supported Plaintiff's case in light of their destruction by Defendants after receipt of a spoliation letter.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This proportionally spaced Brief utilizes 14 point Times New Roman font and contains 13,972 words according to the word count of the word processing system used.

s/ Eric J. Artrip
Eric J. Artrip (ASB-9673-I68E)
Teri Ryder Mastando (ASB-4507-E53T)
D. Anthony Mastando (ASB-0893-X32B)
MASTANDO & ARTRIP, LLC
301 Washington Street, Suite 302
Huntsville, Alabama 35801
Phone:      (256) 532-2222
Fax:          (256) 513-7489
artrip@mastandoartrip.com
teri@mastandoartrip.com
tony@mastandoartrip.com

Neena K. Chaudhry
Fatima Goss Graves
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle, Suite 800
Washington, DC 20036
Phone: (202) 588-5180
Fax: (202) 588-5185
nchaudry@nwlc.org
fgraves@nwlc.org

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this the 10th day of September, 2014, I electronically filed the foregoing with the Clerk of Court and have served a copy of same upon the following by electronic service, by facsimile or by placing a copy of same in the United States mail, postage prepaid and properly addressed.

H. McGriff Belser, III, Esq.
EDWARDS, BELSER & SMITH
123 Lee Street Northeast, Suite A
Decatur, AL 35601

Clay R. Carr, Esq.
BOARDMAN, CARR, BENNETT, WATKINS HILL & GAMBLE, P.C.
400 Boardman Drive
Chelsea, Alabama 35043-8211

s/ Eric J. Artrip_____
Eric J. Artrip
